Filed 6/28/16  P. v. Chavez CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Shasta)

----

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>VINCENT GINO CHAVEZ,<br><br>    Defendant and Appellant. | C074316<br><br>(Super. Ct. No. 12F1499) |

A jury found defendant Vincent Gino Chavez guilty of the first degree murder of Sue Saeturn (Pen. Code,[1] § 187, subd. (a)) and found true the special circumstance that defendant intentionally killed Sue[2] while defendant was an active participant in a criminal street gang and that the murder was carried out to further the activities of the

---

[1]   Further undesignated statutory references are to the Penal Code.

[2]   We shall refer to the victim and many of the witnesses by their first names to avoid confusion.  No disrespect is intended.

1

gang. (§ 190.2, subd. (a)(22).) The murder occurred during an altercation precipitated by defendant's sister who had broken a window of the truck in which Sue was seated because she thought that Sue and his colleagues had kicked her dog.

The jury found true allegations that the murder was committed for the benefit of, at the direction of, or in association with a criminal street gang, with the specific intent to promote, further, or assist in criminal conduct by gang members (§ 186.22, subd. (b)), and defendant personally used a deadly weapon, namely a knife, in committing the murder (§ 12022, subd. (b)).

In a bifurcated proceeding, the trial court found true allegations that defendant suffered one prior conviction within the meaning of sections 1170.12 and 667, subdivision (a), and served one prior prison term within the meaning of section 667.5, subdivision (b).

The trial court sentenced defendant to life in prison without the possibility of parole for the murder (§ 190.2, subd. (a)(22)), plus a consecutive one year for the weapon enhancement (§ 12022, subd. (b)), and a consecutive nine years on another matter.[3]

Defendant appeals, contending the trial court committed various evidentiary and instructional errors, and there is insufficient evidence to support the gang-murder special-circumstance and gang-enhancement findings. We shall conclude that there is insufficient evidence to support the true findings on the gang-murder special-circumstance and gang-enhancement allegations, reverse the judgment as to those findings, and affirm in all other respects.

---

[3] Sentences on the remaining enhancements were imposed and stayed.

2

FACTUAL AND PROCEDURAL BACKGROUND

A.  The Prosecution

In August 2011, defendant was living in San Jose but had been staying with his mother, Rebecca Roman, in Redding for about two months.  On August 13, 2011, defendant attended a birthday party at the home of his sister Jolean Roman.  Defendant's sister lived with her longtime boyfriend at a home on Howard Street in Anderson.  Defendant's mother drove defendant, his "uncle" Francisco Rubalcava, and his uncle's girlfriend to the party.[4]  Prior to the party, defendant texted his uncle and told him to "[w]ear red."  Defendant wore a red hat, red shirt, and jeans to the party.  Defendant's uncle wore a black shirt, black shorts, red shoes, and a red belt.  He also died his facial hair red and had a red bandana in his back pocket.

That same night, Kaochanh (Joe) Saetern, his cousin Sue Saeturn, Jim Saefong, and Sou Orn Sachao attended a birthday party at the Anderson Community Center, across the street from defendant's sister's house.  They left the party around 11:45 p.m., after helping to clean up, and headed to Joe's truck, which was parked near defendant's sister's house.

Around that same time, defendant's sister left her party with Anna Webb and two others to pick up a friend.  While they were stopped at a stop sign in front of defendant's sister's house, they saw defendant's sister's dog run across the street and begin barking at Joe, Sue, Jim, and Sou as they were crossing the street on their way to Joe's truck.  Defendant's sister, who was extremely intoxicated, thought she saw one of the men kick

---

**4**   Defendant and Rubalcava are not related by blood.  Defendant's mother has two children (other than defendant & his sister Jolean) with Rubalcava's brother, and Rubalcava has known defendant for 15 years.  For ease of discussion, we refer to Rubalcava as defendant's uncle herein.

her dog, jumped out of the car, and began yelling and cussing at them.[5] The men yelled back at her, telling her they did not kick her dog. Anna followed defendant's sister, retrieved the dog, and unsuccessfully attempted to get defendant's sister back in the car. Defendant's mother, who was standing on the front step of defendant's sister's (her daughter's) house directed defendant to go and get her.

Defendant and a few other men from the party approached defendant's sister and the four men. Defendant told his sister to "shut up" and "back off." A member of defendant's group asked the four men what was going on, and the four men explained that defendant's sister thought that they were trying to hurt the dog, but they were not. The men exchanged pleasantries and shook hands, and the four men got into Joe's truck and prepared to leave.

After the four men were buckled up and ready to go, they heard a loud noise and one of the truck's passenger-side windows shattered. Defendant's sister had struck the window with her keys, causing it to shatter. Sue immediately got out of the truck, followed by Joe, and then Jim and Sou. It was undisputed that a fight ensued and that Sue was stabbed by defendant during the fight. Witnesses' versions of the fight itself varied.

Joe, who was seated in the driver's seat of the truck, testified that he immediately got out and began yelling and screaming at the group of party goers. He said, "What the hell? Why are you guys doing this? What do you guys want to do?" He was confused because he and his friends had just shaken hands with the people from the party. He walked toward the tailgate of his truck and saw Sue standing there. Sue said he could not

---

[5] Anna testified that the men were attempting to shoo the dog away; she did not see the dog being kicked. Jim testified that the "dog was never touched." Defendant's sister testified that she saw one of "them" kick her dog. Defendant's mother testified that she saw the dog "fly up in the air."

4

breathe very well. Joe walked from the driver's side to the passenger's side of the truck, still looking at the group of partygoers. Once he got to the sidewalk, he saw Sue lying on the ground. He did not see anyone confront Sue or anyone near his truck. His initial thought was that Sue had been shot when the window shattered. As he got out his phone to call 911, he saw people from the party coming towards them. He then heard a few people say, "He's on the phone. Get him." At that point, he ran back to the community center to find help.

Jim, who was seated in the backseat of the truck, testified that he got out of the truck a few seconds after Joe and Sue, and as soon as he did so, he observed a "tussle" about 10 feet behind the truck involving Sue and "like three other people," including defendant and defendant's sister. They were "swinging and fighting." By the time Jim reached the back of the truck, Sue was coming toward him. Sue told Jim that he could not breathe. Jim walked Sue back to the passenger side of the truck. Sue told him that he was bleeding and then collapsed next to the passenger-side door. At that point, many of the people from the party who had been involved in the fight fled, including defendant. Moments later, another group of about 7 to 10 people from defendant's sister's party attacked Jim and Sue. They kicked Sue in the chest and head while he lay on the ground unconscious. The attack lasted about a minute, until Jim recognized one of the attackers and said his name. Police officers arrived a few minutes later.

Sou testified that as soon as he got out of the car, defendant's sister attacked him and knocked his cell phone out of his hand. Sou looked around and saw that Sue had been stabbed and that there was blood all over his clothes. Frightened, he ran back to the community center to get help. He did not see who stabbed Sue.

Anna testified that the truck's driver, Joe, yelled, "You broke my fucking window." She did not hear any of the other occupants say anything. When she saw the passenger door open and one of the occupants step out, she went to retrieve defendant's sister. When she got to the back of the truck, she was knocked down. She did not see

who knocked her down. When she set her hand down to get up, she got blood on it, and then smeared the blood in her hair. When she got up, she ran back to defendant's sister's house to clean up.

Defendant's sister testified that she was intoxicated on the night in question and could not recall certain events. She did recall that after she broke the window the four men got out of the truck and a fight ensued. The victim, Sue, attempted to punch her but missed. She then saw Anna fall to the ground but did not see how she fell. As Anna fell, defendant stepped in front of his sister and fought with Sue. Sue then fell to the ground. Thereafter, defendant whispered to his sister, "I did it for you." As defendant's sister was attempting to leave the scene, one of the four men grabbed her arm, and she turned and knocked the phone out of his hand.

Defendant did not make any gang-related statements or flash any gang signs during the fight.

Defendant's mother ran to her car when she saw people running toward the truck after the window had been shattered. As she pulled up to the stop sign in front of defendant's sister's house, she saw "one of the Asians" hit Anna. Defendant got into the car. He had blood on his hands and told his mother, "I got him. I got him twice." He got out of the car briefly to retrieve his knife, and when he returned they drove off.

Police officers arrived around midnight and described the scene as chaotic. People were in the intersection screaming, others were attempting to leave, while others retreated into defendant's sister's house. A police officer administered cardio-pulmonary resuscitation (CPR) to Sue until emergency medical technicians arrived, but Sue died within minutes. The cause of death was a stab wound to the heart. Defendant's red hat was found next to Sue's body.

Defendant's uncle was in the backyard when his girlfriend advised him that something was happening in front of the house. As he walked out the front door, he saw defendant get inside defendant's mother's car and the car drive off. People were running

6

toward defendant's sister's house, and he and his girlfriend "walked in with everybody else." Defendant sent a text to his uncle's phone, reading: "Make sure you let them fools know I was never there."[6] A text was later sent from defendant's uncle's phone to defendant, stating: "We can't leave cuz the cops have the place surrounded." Later, another text was sent from defendant's uncle's phone to defendant, stating: "And your hat, nigga, you got them outtie."[7]

Defendant's mother drove defendant to the home of Donica and John Wilson so that he could wash the blood off his hands. They were there for 10 or 15 minutes. Before leaving, defendant told Donica that he had been in a car accident, and that the blood was from broken glass. Donica said that she understood. Defendant then asked, "Do you really understand," and Donica responded, "Yes, I do." Sometime thereafter, defendant's mother told Donica that defendant would kill Donica's whole family if she told the police what she had seen.[8] Defendant disposed of the knife later that day.[9]

Defendant's uncle testified that later that same day he asked defendant, "What happened," and defendant responded, "I did what I had to do." Defendant also told his uncle that he had "gotten rid of" his knife by throwing it over a bridge. Later that same

---

[6] Defendant's uncle denied receiving the text.

[7] Defendant's uncle acknowledged that he may have sent the text regarding the house being surrounded by the police but denied sending the text regarding the hat.

[8] At trial, defendant's mother acknowledged threatening Donica and telling her that she should keep her mouth shut about what she saw and that she did not want to deal with defendant. She denied telling Donica that defendant would kill her family.

[9] Defendant's mother pleaded guilty to dissuading a witness by force or threat and influencing testimony by a bribe in connection with this case and admitted that those crimes were committed for the benefit of, in association with, or at the direction of a criminal street gang. She agreed to assist in the underlying investigation in exchange for no prison time and so she "wouldn't lose [her] girls."

day, defendant accompanied his uncle to a friend's house where defendant burned the clothes he had worn to the party.[10]

After the incident, defendant told his sister that people who talk to the police get "dealt with" by being beaten or killed. He also told her to "stay loyal" to him.[11]

In addition to testifying about the events on the night in question and immediately thereafter, defendant's uncle testified about his relationship with the Norteños, and the Norteño gang in general. He, like defendant, grew up in San Jose. There were Norteños "all around" his neighborhood, however, he denied being a member of the gang or "functioning" as a member in San Jose, stating, "I was raised in the neighborhood, but I was never what they call flamed up, wearing red, banging." He explained that he was forced to "choose sides" when he went to jail at the age of 22, and he chose "the Northern side," which meant he was a "Northerner" not a Norteño. He never put in the work that was required to become a Norteño, such as eliminating sex offenders or snitches. When he entered jail, he was screened by the gang before they would permit him to associate with them. He was never fully cleared because he had been convicted of having sex with a minor, a crime that is frowned upon by the gang. He was "faking" being a Norteño when he went to the party with defendant and falsely represented to defendant that he was a Norteño.

Defendant's uncle also testified that red is the primary color of the Norteño gang, and that members often use monikers, or nicknames. Defendant's moniker was

---

[10] Defendant's uncle pleaded guilty to accessory after the fact based on his actions after the stabbing. He agreed to cooperate and give full and truthful testimony in this case in exchange for no prison time.

[11] Defendant's sister pleaded guilty to second degree commercial burglary and unauthorized possession of food stamps in connection with another matter. As part of plea deal, she agreed to testify truthfully at the trial in this case in exchange for a reduction and dismissal of those convictions.

"Monster." Norteños use the number 14 because it stands for the letter "N." He has various tattoos on his body, which he testified showed his affiliation with Northerners, not Norteños. Those tattoos include: red colored webbing, "408," a picture of the State of California with a red star representing San Jose, two sharks with the letters "SJ" in their mouths, and a Huelga bird above the word "San Jose." Defendant told him that he was an active member of Norte San Jose, a subset of the Norteños.

On August 14, 2011, the day after the party, defendant told his then girlfriend that he had "killed someone" during a confrontation over someone kicking his sister's dog. He explained that "he grabbed [the victim's] shirt and then . . . stabbed him in the chest a few times." He also told her that that the victim never touched or threatened him, and that he did not intend to kill him. He said that if she told anyone what he had told her that "it would . . . be all bad" for her.[12]

Defendant's uncle and his then girlfriend testified that defendant usually carried a pocket knife in his back pocket.

Michael Whittington, a former gang detective and gang intelligence officer with the San Jose Police Department, testified for the prosecution as an expert on gangs. He gained his expertise from "the area surrounding San Jose, Santa Clara County." He testified that the Norteño gang is the predominant gang in San Jose, and that the majority of his hundreds of gang contacts were with Norteño members. There are at least 30 active subsets of the Norteños in San Jose. Norteños are aligned with the prison gang Nuestra Familia. Norteños are "foot soldiers" who "are on the streets selling the drugs,

_____

[12] Defendant's then girlfriend agreed to testify against defendant at trial as part of a negotiated plea deal in another case. In exchange for her truthful testimony, she was allowed to plead guilty to attempted robbery and assault with a deadly weapon with no prison time.

[and] doing the crimes for the purposes of sending money and proceeds up to the Nuestra Familia."

Whittington explained that violence is a part of gang life, and that it "is done in order to enact fear in the community, [and] fear in rivals for the purposes of gaining territory and control." It is common for gang members to carry weapons. "Weapons are tools of the trade" and "benefit the gang because the gang needs to be able to fight at a moment's notice; therefore, weapons will traditionally be found in or around gang members." In gang culture, respect is synonymous with fear. Someone who disrespects a gang member will be assaulted.

Whittington testified that Norteños claim the color red and dress in the colors red, black, and white. Tattoos are used to instill fear and show allegiance. The number "14" represents the letter "N," which is the 14th letter of the alphabet, and stands for Norteños. "408" is the area code for San Jose and shows allegiance to that area or the area the gang claims; it is used by Norteños and Sureños. The same is true of symbols associated with sharks. Other symbols associated exclusively with Norteños include the roman numeral XIV, the Huelga bird, and a combination of five dots--one dot on one side and four on the other representing the number 14.

The prosecution solicited testimony from Whittington and presented documentary evidence regarding three "predicate offenses" involving Norteño gang members in Santa Clara County. The first was an assault that occurred on July 25, 2011. A Norteño and a Crip, who wanted to become a Norteño, confronted a 13-year-old boy who was wearing a red belt at a park on the south side of San Jose and asked the boy, "Do you bang?" When the boy responded, "I'm nothing," the two men beat and stabbed him. The men were convicted of attempted murder with a gang enhancement. The second crime was an assault that occurred on May 11, 2011. A Norteño gang member riding in his family van along with his wife and four children saw a Sureño he recognized from juvenile hall in the car next to his, got out of his van, and began stabbing the Sureño in the chest. The

10

Norteño was convicted of attempted murder. The third crime was a robbery committed by defendant, a Norteño, in San Jose on November 6, 2010. Defendant was convicted of robbery, but the crime was not considered gang related.

Whittington also testified that defendant associated with Norteños in jail. Defendant had various gang-related tattoos, including: the word "Norte" on his chest; a shark fin coming out of the water at the base of his left bicep; the number "408" on his left arm; the phrase "San Jo" across his back; one dot on one side of his hand and four dots on the other side; the Huelga bird on his left hand; a "B" in the same form as the Boston Red Sox on his right hand, which is specific to the Norteño subset Barrio East Side; the letters "S" and "J" and a shark fin; and a red "14" on his legs. He also wrote several gang-related pieces of graffiti.

Whittington opined that defendant is a Norteño gang member based on his tattoos, his writings, his prior conviction, and his actions on the night in question. In responding to a hypothetical based on some, but not all, of the circumstances of this case, Whittington opined that such a crime would have been committed for the benefit of and in association with the Norteño criminal street gang. He based his opinion on "the prearrangement, the documentation, the tattoos, those elements prior to the assault and then those actions after the assault."[13] More particularly, he noted that by wearing red and showing visible tattoos, the two Norteños were "demonstrat[ing] their allegiance out

---

[13] The hypothetical posed was as follows: "Two documented gang members who are Norteños go to a party. They pre-arrange to wear red. They both have visible Norteño tattoos. [¶] At some point in the party a person disrespects one of the Norteño[s'] family members. This Norteño's whole family was present. This Norteño walks up and stabs the victim dead through the heart. The Norteño flees the scene, forgetting his red hat and his knife. [¶] Within minutes of leaving the scene, the Norteño texts back to the remaining Norteño, instructing him to keep the party quiet. The remaining Norteño assists the stabbing Norteño by alerting him to forgetting evidence. The stabbing Norteño later provides his clothing and they both destroy the clothing. The witnesses in the case claim they are terrified of the stabber, who is a Norteño."

11

in the open" and "showing their strength in numbers." He also observed that gang members are obligated to retaliate with violence when a family member is disrespected; thus, the first Norteño's violent response to the disrespect shown to his family member was required by the gang. With respect to the Norteño who remained at the party, Whittington observed, "Norteño's come together for the purposes of assisting and associating with themselves to protect themselves to further their criminal activity; therefore, Norteños acting in concert after the crime . . . occurs quite frequently." The additional circumstance that no gang signs were thrown or gang slurs made did not change Whittington's opinion.

Whittington acknowledged that a gang member can commit a crime that is not gang related, and pointed to the robbery committed by defendant as an example of such a crime, reasoning that defendant "acted alone, nothing was shouted. There was no other evidence of anything besides a robbery."

Robert Marquez, a veteran gang investigator who had been assigned to the Redding Police Department, also testified as a gang expert for the prosecution. He had spoken to over 1,000 gang members about their tattoos, the structure and methodologies of the gang, and their involvement with and status within the gang. He testified about the structure of the gang and its origins. The first prison gang was the Mexican Mafia. Its purpose was to protect all Hispanics. It eventually splintered into two groups, one of which was Our Family, which became Nuestra Familia or "NF." The Nuestra Familia commissioned the Northern Structure prison gang. In the late 1970's and early 1980's there became a "huge distinction" between north and south, and "what we call Sureños and Norteños." He explained that "there has been a migration of southern Hispanic street gangs moving north, but we have not seen Norteños going south." In 2010 and 2011, the Nuestra Familia was attempting to establish a "street regiment" in Shasta County. Marquez had spoken directly with Norteños who were trying to gain a foothold in Shasta County, and by August 14, 2011, law enforcement had identified at least 20 Norteños

12

who were trying to establish a "street regimen[t]" in Shasta County, members of which had committed a variety of crimes in Shasta County, including assault with a deadly weapon, attempted murder, and murder.

According to Marquez, violence is crucial to the Norteños and all prison and street gangs because it translates into fear, which translates into power. Fear benefits the gang because it helps it control its members, creates a level of notoriety which helps with recruiting new members, and dissuades members of the community from reporting the criminal activities of gang members. Marquez also testified about Norteño clothing, tattoos, colors, and the various ways members are brought into the gang.

Marquez further testified that the primary activities of the Norteños "would be any of the 33 crimes that are outlined in Penal Code [section] 186.22." He testified specifically as to two such crimes. The first occurred in Shasta County in July 2010. A Norteño dressed as a Sureño kidnapped an active Sureño gang member, drove him to the west side of Redding, and "fired a firearm at him attempt[ing] to kill him." The Norteño was convicted of attempted murder and kidnapping. The second incident also took place in Shasta County. In June 2000, a Norteño encountered a Sureño inside a Circle K market, asked the Sureño which gang he belonged to, and when the Sureño did not respond, the Norteño and another man beat the Sureño. The Norteño was convicted of assault with force likely to cause great bodily injury.

Marquez opined that defendant was a Norteño gang member and a Northern Structure prison associate. He based his opinion on two incidents. The first incident occurred in Corning and involved defendant attacking a rival gang member, while wearing clothing associated with the Norteño street gang, shouting Norteño gang terms, and "throwing" Norteño gang signs. The second incident occurred at the Tehama County Jail and involved defendant assaulting another prisoner. The victim advised jail staff that he believed defendant attacked him on behalf of another Norteño with whom the victim had argued.

13

The prosecution posed the same hypothetical to Marquez as it posed to Whittington, with the additional fact that the Norteño who stabbed the nongang member arrived at the party armed with a knife. In response to the hypothetical, Marquez opined that such a crime "was a gang-related act that benefits that gang." He testified that the crime was gang related because two gang members agreed to show up to the party dressed in gang colors, and as a general rule gang members arm themselves for their personal protection and for the protection of other gang members. In responding violently to the disrespect shown to his immediate family member, the Norteño acted in accordance with established street gang rules. Had the Norteño failed to respond in that manner, he would have lost stature in the gang and been viewed as weak. The crime benefited the gang because the "sheer ferocity" of the act would encourage fellow gang members to follow orders and instill fear in the community. It would also increase the Norteño's notoriety within the gang, and the gang's stature within the community.

On cross-examination, Marquez acknowledged that it would be "completely out of character" for a Norteño who sees his sister being yelled at and disrespected by a group of people to come up and shake hands with those people. Such behavior would not increase the Norteño's status within the gang. Marquez also acknowledged that it is possible for a gang member to commit a crime not for the benefit of a gang.

B. The Defense

Dr. Rahn Minagawa, a clinical and forensic psychologist, testified for the defense as an expert in gang psychology. Minagawa testified that defendant was a Norteño gang member. He based his opinion on defendant's tattoos, history, and prior interactions with law enforcement. He explained that it was possible for a gang member to engage in criminal activity that was not for the benefit of the gang, such as a response to an attack on a family member. In response to a hypothetical that mirrored the circumstances of this case, Minagawa opined that the gang member coming to the aid of his sister would not be for the benefit of the gang.

14

Defendant did not testify at trial.  During closing argument, the defense conceded that defendant is a gang member and that he stabbed Sue.  The defense's theory was that the stabbing was the result of a "sudden, rash decision," and thus, defendant lacked the malice aforethought required for murder.  The defense argued defendant was guilty of voluntary manslaughter because there was no malice aforethought, and even if there was, he acted in imperfect defense of his sister when he stabbed Sue.

I
Defendant's Sixth Amendment Right to Confront Witnesses
Was Not Violated When Gang Experts Relied on
and Revealed to the Jury the Contents of Otherwise Inadmissible Hearsay

Citing *Crawford v. Washington* (2004) 541 U.S. 36 [158 L.Ed.2d 177] (*Crawford*), defendant contends that his Sixth Amendment right to confront witnesses was violated when the prosecution's gang experts were allowed to rely on and present large amounts of testimonial hearsay to the jury in rendering their opinions.  He asserts that the evidence upon which the experts relied necessarily was offered for its truth, otherwise the experts' opinions would have been irrelevant.  He acknowledges that his argument is contrary to our Supreme Court's decision in *People v. Gardeley* (1996) 14 Cal.4th 605 (*Gardeley*), which held that reliable hearsay evidence is admissible under Evidence Code sections 801 and 802 for the nonhearsay purpose of revealing the basis for an expert witness's opinion and, in that context, is not admitted for the truth.  However, he submits that we are not bound by *Gardeley* because it did not address the confrontation clause.  He also claims that a majority of the United States Supreme Court and our Supreme Court have rejected the notion that an out-of-court statement relied on by an expert witness for its truth is not admitted for its truth.  (*Williams v. Illinois* (2012) 567 U.S. ___ [183 L.Ed.2d 89] (*Williams*); *People v. Dungo* (2012) 55 Cal.4th 608 (*Dungo*).)  As we shall explain, there is no United States Supreme Court or California Supreme Court case holding that testimony regarding the basis for an expert's opinion, which was not admitted for its truth at trial, must nevertheless be regarded as admitted for

15

its truth for purposes of the Sixth Amendment's right of confrontation. While the concurring and dissenting opinions in *Williams* and *Dungo* may signal how those courts will rule in future cases, we remain bound by *Gardeley*.[14]

The Sixth Amendment to the federal Constitution guarantees a defendant's right to confront adverse witnesses. (U.S. Const., 6th Amend.; see also *People v. Lopez* (2012) 55 Cal.4th 569, 576.) In *Crawford*, the United States Supreme Court held that the prosecution may not rely on testimonial hearsay unless the declarant is unavailable to testify, and the defendant had a prior opportunity for cross-examination. (*Crawford, supra*, 541 U.S. at p. 59, fn. 9.) " 'Hearsay evidence' is evidence of a statement that was made other than by a witness while testifying at the hearing and that is offered to prove the truth of the matter stated." (Evid. Code, § 1200, subd. (a).) A statement which is not offered to prove the truth of the matter asserted does not constitute hearsay, and its use is not barred by the confrontation clause. (*Crawford*, at p. 59, fn. 9 ["The Clause . . . does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted . . . ."].)

It has long been the law in California that experts may base their opinions " 'on reliable hearsay, including out-of-court declarations of other persons.' " (*Gardeley, supra*, 14 Cal.4th at p. 618; see also Evid. Code, § 801, subd. (b).) "And because Evidence Code section 802 allows an expert witness to 'state on direct examination the reasons for his opinion and the matter . . . upon which it is based,' an expert witness

---

[14] Because defendant claims that the admission of this and other "gang evidence" contributed to the jury's first degree murder verdict as well as its findings on the gang-murder special-circumstance and gang-enhancement allegations, our reversal of the true findings on the gang-murder special-circumstance and gang-enhancement allegations (at pp. 35-41, *post*) does not render defendant's claims concerning the gang evidence, which are addressed in sections I, II, III, and IV herein, moot.

whose opinion is based on such inadmissible matter can, when testifying, describe the material that forms the basis of the opinion." (*Gardeley*, at p. 618.)

In *Gardeley*, our Supreme Court concluded that a gang expert properly relied on and revealed to the jury the contents of otherwise inadmissible hearsay in testifying on direct examination that a hypothetical assault by three gang members was gang related. (*Gardeley*, *supra*, 14 Cal.4th at pp. 611-613, 618-619.) The court reasoned that it was proper for the expert to relate the contents of the out-of-court statement to the jury because it was not offered for its truth but for the nonhearsay purpose of explaining the basis of the expert's opinion. (*Id.* at pp. 618-619.)

*Gardeley* was decided eight years before *Crawford*, and thus, does not address whether *Crawford* applies to out-of-court statements that are used as the basis for an expert's opinion. In *People v. Thomas* (2005) 130 Cal.App.4th 1202 (*Thomas*), our colleagues in the Fourth Appellate District considered the issue and found no *Crawford* violation. (*Thomas*, at pp. 1209-1210.) Relying on *Gardeley* and *Crawford's* admonition that the confrontation clause does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted, the court concluded that a gang expert, in opining that the defendant was a gang member, properly relied on and testified to the contents of hearsay statements by other gang members that the defendant was a gang member. (*Thomas*, at pp. 1206, 1208-1210.) The court reasoned, "*Crawford* does not undermine the established rule that experts can testify to their opinions on relevant matters, and relate the information and sources upon which they rely in forming those opinions. This is so because an expert is subject to cross-examination about his or her opinions and additionally, the materials on which the expert bases his or her opinion are not elicited for the truth of their contents; they are examined to assess the weight of the expert's opinion." (*Id.* at p. 1210; see also *People v. Cooper* (2007) 148 Cal.App.4th 731, 746-747 ["*Crawford* was concerned with the substantive use of hearsay evidence . . . . It did not suggest that the confrontation clause was implicated by admission of hearsay

17

for nonhearsay purposes."]; *People v. Ramirez* (2007) 153 Cal.App.4th 1422, 1426-1427 ["Hearsay in support of expert opinion is simply not the sort of testimonial hearsay the use of which *Crawford* condemned."]; *People v. Sisneros* (2009) 174 Cal.App.4th 142, 153-154 [same].)

In *People v. Hill* (2011) 191 Cal.App.4th 1104 (*Hill*), our colleagues in the First Appellate District, questioned *Thomas's* reasoning, noting that *Gardeley* and *Thomas* were based on the "implied assumption that the out-of-court statements may help the jury evaluate the expert's opinion without regard to the truth of the statements. . . . But this assumption appears to be incorrect." (*Hill*, at pp. 1129-1130.) The court observed that "where basis evidence consists of an out-of-court statement, the jury will often be required to determine or assume the truth of the statement in order to utilize it to evaluate the expert's opinion." (*Id.* at p. 1131, fn. omitted.) Nevertheless, the court concluded that it was bound by *Gardeley* and similar precedent supporting *Thomas*: "But for the long line of California Supreme Court precedent supporting *Thomas*, we would reject that opinion . . . . But our position in the judicial hierarchy precludes that option; we must follow *Gardeley* and the other California Supreme Court cases in the same line of authority." (*Hill*, at p. 1131, fn. omitted.)

"Since *Hill*, a majority of justices on both the United States Supreme Court and our high court have indicated expert basis evidence is offered for its truth and subject to the confrontation clause. (*Williams v. Illinois* (2012) 567 U.S. ___ [183 L.Ed.2d 89] (*Williams*); *People v. Dungo* (2012) 55 Cal.4th 608 (*Dungo*).) In *Williams*, the defendant challenged a laboratory expert's testimony that a DNA report from a prior kidnapping, rape, and robbery—which was not introduced into evidence—matched a DNA sample taken from the defendant upon his arrest on unrelated charges. In a four-to-one-to-four decision, the court held there was no confrontation clause violation, but a majority of justices could not agree on a rationale. Justice Alito, in a plurality opinion joined by the Chief Justice and [Justices Kennedy and Breyer], reasoned the report was not offered for

18

its truth, but for the limited purpose of explaining the basis for the assumptions underlying the expert's independent conclusion that the samples matched, and even if it was admitted into evidence for its truth, the report was not testimonial.  (*Williams*, *supra*, 567 U.S. at p. ___ [132 S.Ct. at p. 2228] (plur. opn. of Alito , J.).)  The five other justices in two opinions (Justice Thomas, concurring in the judgment, and Justice Kagan, joined by three other justices, dissenting) all expressed the view the report was offered for its truth, although Justice Thomas found it was not testimonial, while the dissenting justices found it was.  (*Id.* at p. ___ [132 S.Ct. at p. 2257] (conc. opn. of Thomas, J.) ['[S]tatements introduced to explain the basis of an expert's opinion are not introduced for a plausible nonhearsay purpose.']; *id.* at p. ___ [132 S.Ct. at p. 2260] (conc. opn. of Thomas, J.); *id.* at pp. ___, ___ [132 S.Ct. at pp. 2268, 2271] (dis. opn. of Kagan, J.) [the expert's description of the report 'was offered for its truth because that is all such "basis evidence" can be offered for']; *id.* at p. ___ [132 S.Ct. at p. 2273] (dis. opn. of Kagan, J.).)

"In *Dungo*, a forensic pathologist testified the victim in the case had been strangled, basing his opinion on facts contained in an autopsy report by another pathologist, which was not introduced into evidence.  (*Dungo*, *supra*, 55 Cal.4th at pp. 618–619.)  The majority opinion, written by Justice Kennard and joined by the Chief Justice and three other justices, concluded the statements in the autopsy report were not testimonial, and therefore not subject to the confrontation clause.  (55 Cal.4th at p. 621.)  That opinion did not address the hearsay issue, although it noted the *Williams* plurality's nonhearsay rationale.  (*Dungo*, at p. 618.)  Justice Werdegar wrote a concurring opinion, however, which garnered majority support (joined by the Chief Justice and two other justices), explaining the statements in the report were offered for their truth, so they were subject to the confrontation clause.  (55 Cal.4th at p. 627 (conc. opn. of Werdegar, J.).)  In dissent, Justice Corrigan, joined by Justice Liu, noted, "When an expert witness treats as factual the contents of an out-of-court statement, and relates as true the contents of that

19

statement to the jury, a majority of the high court in *Williams* . . . rejects the premise that the out-of-court statement is not admitted for its truth." (*Id.* at p. 635, fn. 3 (dis. opn. of Corrigan, J.).)" (*People v. Valadez* (2013) 220 Cal.App.4th 16, 31-32 (*Valadez*), fn. omitted.)

In *Valadez*, the court ultimately determined that the statements at issue were not testimonial, and thus, did not reach the issue of whether the statements were offered for the truth. (*Valadez, supra*, 220 Cal.App.4th at p. 32.) The court did, however, make the following observation, which we find instructive: "If the currently constituted courts were called upon to resolve this issue, it seems likely the holdings in *Thomas*, *Hill*, and other cases extending *Gardeley* to find out-of-court statements offered as expert basis evidence are not offered for their truth for confrontation purposes will be significantly undermined." (*Ibid.*) The court, however, clarified that "[t]his does not mean *Gardeley's* holding that an expert may rely on inadmissible hearsay as a matter of state evidentiary law is no longer a viable rule." (*Id.* at p. 32, fn. 13.)

Here, defendant contends that "given our Supreme Court's subsequent holdings, *Gardeley* is no longer valid on this point." The problem with defendant's contention is that as of yet, there is no United States Supreme Court or California Supreme Court case *holding* that testimony regarding the basis for an expert's opinion, which was not admitted for its truth at trial, must nevertheless be regarded as admitted for its truth for purposes of the Sixth Amendment's right of confrontation.[15] The common view

---

[15] It appears our Supreme Court will have an opportunity to address this issue in the not too distant future. While this case was pending on appeal, our Supreme Court granted a petition for review in *People v. Sanchez* (2014) 223 Cal.App.4th 1, review granted May 14, 2014, S216681. The Supreme Court news release issued when review was granted states: "This case presents the following issue: Was defendant's Sixth Amendment right to confrontation violated by the gang expert's reliance on testimonial hearsay (*Crawford v. Washington* (2004) 541 U.S. 36)?" (Cal. Supreme Ct., News Release (May 16, 2014) <http://www.courts.ca.gov/documents/ws051214.pdf> [as of June 21, 2016].)

20

expressed in the concurring and dissenting opinions in *Williams* and *Dungo*, that the extrajudicial basis of an expert's opinion is necessarily considered for its truth, may not be taken as a holding by either court since it is not yet the basis of any judgment. (See *Dungo*, *supra*, 55 Cal.4th at pp. 627-629 (conc. opn. of Chin, J.).) In other words, while the concurring and dissenting opinions in those cases may signal how those courts would rule in future cases, they have no precedential value here.

As an intermediate court, we are required to follow *Gardeley's* holding that basis evidence for a gang expert's opinion is not offered as " 'independent proof' of any fact." (*Gardeley, supra,* 14 Cal.4th at p. 619; see *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455; see also *Hill*, *supra*, 191 Cal.App.4th at pp. 1131-1132.) Because the challenged evidence was admitted for the limited purpose of explaining the basis of the gang experts' opinions, its admission did not run afoul of the Sixth Amendment right to confrontation.

## II
### The Trial Court Did Not Err in Allowing Marquez and Defendant's Uncle to Provide Gang Testimony

Defendant next contends that the trial court abused its discretion in allowing multiple witnesses to testify "regarding the history of the gang, gang customs, predicate offenses, specific instances of violence and the recapitulation of slides of graffiti and [defendant's] gang tattoos . . . ." More particularly, he asserts that such testimony should have been limited to Whittington, and that Marquez's and defendant's uncle's testimony on those subjects "was cumulative, inflammatory and should have been excluded" under Evidence Code section 352. Defendant also claims that "the admission of this speculative, propensity evidence was so prejudicial" that it violated his federal constitutional right to due process of law. As we shall explain, defendant forfeited his contention with respect to much of the challenged testimony, and in any event, his contention lacks merit.

As a preliminary matter, the People assert that defendant forfeited his federal constitutional claim and most of his state law claim by failing to object below.  Defendant failed to object to his uncle's testimony on any of the grounds urged on appeal, and thus forfeited his state and federal claims related thereto.  (Evid. Code, § 353; *People v. Partida* (2005) 37 Cal.4th 428, 435-438.)  Defendant likewise failed to object to large portions of Marquez's testimony on the grounds urged on appeal, and thus, forfeited his state and federal claims concerning those portions of the testimony.[16]  (Evid. Code, § 353; *Partida,* at pp. 435-438.)  We need not parse through Marquez's testimony to determine which claims were preserved or consider defendant's claim that any additional objections would have been futile because, as we shall explain, the trial court did not err in admitting the challenged testimony.

Evidence Code section 352 provides:  "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."  We review a trial court's ruling under this section for abuse of discretion and will reverse a trial court's exercise of discretion to admit evidence "only if 'the probative value of the [evidence] clearly is outweighed by [its] prejudicial effect.'  [Citation.]" (*People v. Carey* (2007) 41 Cal.4th 109, 128.)  " 'Prejudice for purposes of Evidence Code section 352 means evidence that tends to evoke an emotional bias against the defendant with very little effect on issues, not evidence that is probative of a defendant's guilt.'  [Citation.]" (*People v. Tran* (2011) 51 Cal.4th 1040, 1048 (*Tran*).)

---

[16]  Defendant objected to Marquez's testimony concerning the relationship between the Norteños and the Nuestra Familia and the role of violence in the Norteño gang as "repetitive" and "accumulative."  Later, half way through Marquez's direct examination, defendant interposed a standing objection on those same grounds when Marquez was asked about the role of weapons in the Norteño gang.

Defendant was charged with one count of first degree murder, with a gang-murder special circumstance and gang enhancement. In order to sustain a true finding on the gang-murder special-circumstance allegation, the prosecution was required to prove beyond a reasonable doubt that defendant intentionally killed Sue while he was an active participant in a criminal street gang, as defined in subdivision (f) of section 186.22, and the murder was carried out to further the activities of the criminal street gang. (§ 190.2, subd. (a)(22).)

To sustain a true finding on the gang-enhancement allegation, the prosecution was required to prove beyond a reasonable doubt that the crime was "committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members." (§ 186.22, subd. (b)(4).)

Defendant complains that his uncle "testified not only to the events on the night of the stabbing, but also to Norteños colors and the use of the number 14 and how gangs operate in County Jail." Much of defendant's uncle's testimony about the Norteños and how gangs operate in jail was based on personal experience and was relevant to whether he (defendant's uncle) was a Norteño, which in turn was relevant to the prosecution's claim that Sue's murder was committed in association with the Norteño street gang and with the intent to further the gang's activities. (See *People v. Albillar* (2010) 51 Cal.4th 47, 68 (*Albillar*) ["[I]f substantial evidence establishes that the defendant intended to and did commit the charged felony with known members of a gang, the jury may fairly infer that the defendant had the specific intent to promote, further, or assist criminal conduct by those gang members."].) Such testimony was not duplicative of that offered by Whittington or Marquez. To the extent defendant's uncle's testimony concerning the color red, the number 14, and how the gangs operate in county jail was duplicative of the testimony offered by Whittington or Marquez, the trial court reasonably could conclude that the probative value of such testimony outweighed any potential prejudice because it

23

came from an insider as opposed to an expert witness. "Evidence that is identical in subject matter to other evidence should not be excluded as 'cumulative' when it has greater evidentiary weight or probative value." (*People v. Mattson* (1990) 50 Cal.3d 826, 871, quoting *People v. Carter* (1957) 48 Cal.2d 737, 748-749.) Accordingly, the trial court did not abuse its discretion in allowing such testimony.

Defendant complains that when Marquez testified, "he duplicated [Whittington's and defendant's uncle's] testimony and added even more." As the trial court explained in overruling defendant's objections to certain portions of Marquez's testimony as cumulative in light of Whittington's testimony, "Although the testimony overlapped to a certain degree, I don't find that it's cumulative and under Evidence Code Section 352, I find it to be more probative than prejudicial, that it's highly relevant. [¶] The San Jose investigator [Whittington], although he had expertise in gangs in general, his primary focus was on San Jose gangs and evidence associated with Norteño[s], which he demonstrated he's very familiar with, plus, he testified to other matters, such as interpreting the text messages and that start [*sic*] of thing. [¶] And Agent Marquez I think has a broader understanding of gangs focused on prison gangs, documenting gangs in prison. He also testified about our area locally and his use of experience talking with gang members, both connected with the prison and in the Redding area, as well as talking more about the gang structure and organization both on the street and in the prison. So I don't find it's cumulative. To the extent that it is, it's relevant." We are persuaded by the trial court's reasoning and conclude that it did not abuse its discretion in allowing the challenged testimony.

"Because there was no statutory error, [defendant's] constitutional claims, insofar as they are cognizable on appeal, fail." (*People v. Valdez* (2012) 55 Cal.4th 82, 134.)

24

### III
#### Marquez Did Not Offer an Improper Opinion on Defendant's Guilt

Defendant claims that the prosecution's gang expert Marquez "improperly commented on [his] guilt" by referring directly to defendant in responding to a hypothetical question. Defendant further claims the prosecutor "committed misconduct and exacerbated the problem" by referring directly to defendant in a follow-up question. To the extent "additional objection was necessary to preserve any of these issues for appeal, [defendant] asserts he received . . . ineffective assistance of counsel . . . ." As we shall explain, Marquez did not offer an opinion on defendant's guilt; accordingly, there was no error or misconduct, and counsel was not ineffective in failing to object.

In her case-in-chief, the prosecutor posed a hypothetical to Marquez based on the facts of the charged crime and asked him whether the crime "was committed for the benefit [of] or in association with a criminal street gang?" Marquez testified that "it is definitely a gang-related offense." The prosecutor then asked Marquez to explain the basis of his opinion. Marquez said that his opinion was "based on the totality of the incident. You have a gang member request that another gang member show up to a party wearing gang colors. Gang members, as a general rule, arm themselves for their personal protection and for the protection of other gang members. [¶] Whether or not the family member was a gang member, for me, is irrelevant, in that the non-gang family member is still related to the gang member. Family is family and that extends across the gang to the immediate family who may have or may not have gang ties. [¶] Again, for, in this case, Chavez, not to respond to defend his sister to avenge this slight or perceived disrespect would be seen as cowardice or weakness on his part. And again, it would diminish his stature within the gang in front of the other gang member who was there. And so Chavez had an obligation to act to protect his own reputation within the gang."

The prosecutor then asked Marquez, "How, under that set of facts, do you think it would further promote the gang and the criminal conduct of the gang specifically?"

Marquez explained that "a gang member committing such a vicious act" would gain notoriety for himself and stature for the gang in the community. Marquez continued, "I can assure you that people in prison have heard about this incident. They get newspapers and they are allowed to watch TV and they see a newscast, so they have heard about this incident so it has increased the stature of the Norteños in Shasta County." Defendant's trial counsel objected on the grounds the testimony was speculative "as far as who has seen what on what TV." The trial court overruled the objection and then sought to clarify that Marquez had no personal knowledge that anyone in prison had actually read about the underlying crime in the paper, and Marquez responded, "Not read in the paper, but . . . I have talked to confidential informants who have stated things about Vinny Chavez, Vincent Chavez, in relationship to this homicide." The prosecutor then asked, "[I]n my hypothetical there were people around who may or may not have been gang members who watched and knew that Vincent Chavez had killed an innocent man. Would it have needed to have been another gang member who knew or watched this for the gang to have benefited from the act?" Marquez responded in the negative, explaining that anyone who had seen or heard about such an act would fear the perpetrator and that fear would translate into power.

The prosecutor next asked Marquez, "Hypothetically, would a street gang member who went to prison after having viciously stabbed someone through the heart gain additional status in the Norteño gang in custody?" Marquez responded, "It has been my experience that that is the case. An individual is going to show up into the in-custody setting in prison, he's going to have to fill out his new arrival questionnaire, talk about the criminal offenses he's committed in custody and out of custody, and individuals that belong to the Norteño gang and the Northern Structure prison gang are going to review that new arrival questionnaire . . . and they are going to know about the ferocity of that crime." Thereafter, the trial court asked Marquez, "[I]n general, is your opinion as to individuals who would commit a crime of murder and then enter the prison, not as to this

26

specific defendant, but this is based on your training and experience from what may occur in a similar situation; is that fair to say?" Marquez responded in the affirmative, explaining that "an individual who commits a murder would have greater status than an individual that sold narcotics or robbed a 7/11." The trial court then admonished the jury "that that part of [Marquez's] answer doesn't apply to the defendant in this particular case, that that is something that is going to happen with this defendant because that is up to the jury to decide what the outcome is of this particular case. So he's talking in generalities of individuals who would enter prison after having committed a crime that would be gang-related . . . ."

Relying on *People v. Vang* (2011) 52 Cal.4th 1038, 1048 (*Vang*), defendant argues that Marquez, with the prosecutor's assistance, improperly offered opinions on defendant's guilt and that such testimony should have been excluded. In *Vang*, the California Supreme Court held that it was permissible for a gang expert to give his opinion that an assault committed in the manner described in a hypothetical question would be gang related. (*Id.* at p. 1049.) In doing so, the court discussed the Fifth District's prior decision in *People v. Killebrew* (2002) 103 Cal.App.4th 644, 647, which held that a gang expert may not testify about the subjective knowledge and intent of a defendant with respect to the crime charged. (*Vang,* at p. 1048.) "To the extent that *Killebrew*, *supra*, 103 Cal.App.4th 644, was correct in prohibiting expert testimony regarding whether the specific defendants acted for a gang reason, the reason for this rule is not that such testimony might embrace the ultimate issue in the case. 'Testimony in the form of an opinion that is otherwise admissible is not objectionable because it embraces the ultimate issue to be decided by the trier of fact.' [Citations.] Rather, the reason for the rule is similar to the reason expert testimony regarding the defendant's guilt in general is improper. 'A witness may not express an opinion on a defendant's guilt. [Citations.] The reason for this rule is not because guilt is the ultimate issue of fact for the jury, as opinion testimony often goes to the ultimate issue. [Citations.] "Rather,

opinions on guilt or innocence are inadmissible because they are of no assistance to the trier of fact. To put it another way, the trier of fact is as competent as the witness to weigh the evidence and draw a conclusion on the issue of guilt." ' [Citations.]" (*Ibid.*, fn. & italics omitted.) The *Vang* court concluded that the gang expert in that case "could not testify directly whether [the defendants] committed the assault for gang purposes" because he was not at the scene and "had no personal knowledge whether any of the defendants assaulted [the victim] and, if so, how or why." (*Ibid.*) Under those circumstances, the court found that "the jury was as competent as the expert to weigh the evidence and determine what the facts were, including whether the defendants committed the assault." (*Ibid.*) The court also determined that the expert "properly could, and did, express an opinion, based on hypothetical questions that tracked the evidence, whether the assault, if the jury found it in fact occurred, would have been for a gang purpose." (*Ibid.*)[17]

Here, Marquez properly opined that a homicide committed in the manner described in the hypothetical was gang related. We recognize that some of his responses and one of the prosecutor's questions strayed from the hypothetical and referred directly to defendant and/or the incident in question. Marquez, however, never testified directly that defendant stabbed Sue for a gang purpose or with the intent of promoting, furthering, or assisting the criminal conduct of gang members. In explaining the basis for his opinion that the crime described in the hypothetical was gang related, Marquez stated that he considered it irrelevant that the family member who had been involved in the

---

[17] Contrary to defendant's assertion, *Vang* did not hold that an expert may never offer an opinion on a defendant's specific intent. To the contrary, the court observed: "It appears that in some circumstances, expert testimony regarding the specific defendants might be proper. [Citations.] The question is not before us. Because the expert here did not testify directly about the defendants, but only responded to hypothetical questions, we will assume for present purposes the expert could not properly have testified about the defendants themselves." (*Vang*, *supra*, 52 Cal.4th at p. 1048, fn. 4.)

28

argument that led to the stabbing was not a gang member because "[f]amily is family and that extends across the gang to the immediate family . . . ." He then applied that general statement directly to defendant, stating in pertinent part, "Chavez ha[d] an obligation to act to protect his own reputation within the gang." When considered in context, it is clear that Marquez was offering an opinion as to the expected response of a gang member under the circumstances of this case. Significantly, he did not testify directly that defendant stabbed Sue to protect his own reputation within the gang, but rather that a gang member in defendant's position would have felt obligated to respond with violence. Marquez's subsequent statement that he had been told that prison inmates knew about defendant's crime as a basis for his opinion that defendant's actions increased the stature of the gang, does not amount to an opinion concerning defendant's subjective intent. In any event, the trial court clarified that Marquez's opinion "as to individuals who would commit a crime of murder and then enter . . . prison" was "not as to this specific defendant" and admonished the jury that Marquez's response did not apply to "the defendant in this particular case." Finally, the prosecutor's direct reference to defendant in the midst of her hypothetical did not turn Marquez's response thereto into improper opinion testimony. The prosecutor observed that "in my hypothetical there were people around who may or may not have been gang members who watched and knew that Vincent Chavez had killed an innocent man. Would it have needed to have been another gang member who knew or watched this for the gang to have benefited from the act?" Marquez responded to the question in hypothetical terms and did not refer directly to defendant but rather to "this individual." Given the context in which the challenged remarks were made, we find that it was sufficiently clear to the jury that Marquez was expressing an opinion on how he would expect a gang member to react under the circumstances described in the hypothetical, not on defendant's subjective intent in this instance.

29

Finally, in light of the foregoing, defense counsel was not deficient for not raising an objection to the challenged testimony. (See *People v. Bradley* (2012) 208 Cal.App.4th 64, 90 ["Failure to raise a meritless objection is not ineffective assistance of counsel."]

IV

Evidence of Defendant's Prior Robbery Conviction
Was Properly Admitted as a Predicate Offense

Defendant contends that the trial court abused its discretion and violated his right to due process of law in allowing the prosecution to introduce evidence of his prior robbery conviction as a predicate offense to prove a pattern of criminal activity. He is mistaken.

Over defendant's objection, the trial court allowed the prosecutor to introduce evidence of defendant's prior robbery conviction as a predicate offense under section 186.22, subdivision (e). The prosecution presented documentary and testimonial evidence that: defendant, a gang member, committed a robbery on November 6, 2010, in San Jose; the robbery was not gang related; and defendant was later convicted of that offense.

Evidence Code section 1101 prohibits the admission of character or propensity evidence "when offered to prove his or her conduct on a specified occasion." (Evid. Code, § 1101, subd. (a); hereinafter section 1101).) Section 1101, however, does not prohibit, "the admission of evidence that a person committed a crime . . . when relevant to prove some fact . . . other than his or her disposition to commit such an act." (Section 1101, subd. (b).) Even when evidence of a prior conviction, however, may be admitted under subdivision (b) of section 1101, admission of that evidence must still comport with other policies limiting the admission of evidence, such as those contained in Evidence Code section 352. (*People v. Thompson* (1988) 45 Cal.3d 86, 109.)

To prove the gang-murder special-circumstance and gang-enhancement allegations, the prosecutor was required to establish, among other things, that the gang's

30

members engaged in a pattern of criminal activity. (*People v. Williams* (2009) 170 Cal.App.4th 587, 608-609; §§ 186.22, subds. (b)(4), (e), (f), 190.2, subd. (a)(22).) A " 'pattern' " is established by the commission of two or more offenses enumerated in section 186.22, subdivision (e), committed on separate occasions or by two or more persons. (§ 186.22, subd. (f); *People v. Williams,* at p. 609.) An offense need not be gang related to qualify as a predicate offense under section 186.22, subdivision (e). (*Gardeley, supra,* 14 Cal.4th at pp. 610, 621-622.)

Defendant does not dispute that evidence of his prior robbery conviction, which is among the offenses enumerated section 186.22, subdivision (e), was relevant and admissible under section 1101, subdivision (b) to prove the gang's members were engaged in a pattern of criminal activity. Rather, he contends that evidence of his prior robbery conviction should have been excluded under Evidence Code section 352 as unduly prejudicial.

"Without doubt, evidence a defendant committed an offense on a separate occasion is inherently prejudicial. [Citations.] But Evidence Code section 352 requires the exclusion of evidence only when its probative value is substantially outweighed by its prejudicial effect. 'Evidence is substantially more prejudicial than probative [citation] [only] if, broadly stated, it poses an intolerable "risk to the fairness of the proceedings or the reliability of the outcome" [citation].' [Citation.]" (*Tran*, *supra*, 51 Cal.4th at p. 1047.) As the court noted in *Tran,* our Supreme Court has "identified several factors that might serve to increase or decrease the probative value or the prejudicial effect of evidence of uncharged misconduct and thus are relevant to the weighing process required by Evidence Code section 352." (*Ibid.*) "The probative value of the evidence is enhanced if it emanates from a source independent of evidence of the charged offense because the risk that the witness's account was influenced by knowledge of the charged offense is thereby eliminated. [Citation.] On the other hand, the prejudicial effect of the evidence is increased if the uncharged acts did not result in a criminal conviction. This is

31

because the jury might be inclined to punish the defendant for the uncharged acts regardless of whether it considers the defendant guilty of the charged offense and because the absence of a conviction increases the likelihood of confusing the issues, in that the jury will have to determine whether the uncharged acts occurred. [Citation.] The potential for prejudice is decreased, however, when testimony describing the defendant's uncharged acts is no stronger or more inflammatory than the testimony concerning the charged offense. [Citation.]" (*Ibid.*)

Here, the evidence of defendant's prior robbery was probative in that it provided direct evidence of a predicate offense. (See *Tran*, *supra*, 51 Cal.4th at p. 1048.)[18] Moreover, defendant's conviction of robbery occurred several months before his arrest on the current change. The probative value of the evidence accordingly was enhanced because the evidence emanated from an independent source that could not have been influenced by knowledge of the charged offense. (See *Tran*, at p. 1050.) Because defendant stood convicted of the robbery, there was little danger of confusing the issues by requiring the jury to determine if defendant was guilty of both the charged offense and the robbery, and no risk the jury might convict defendant to prevent him from escaping punishment for the robbery. (See *ibid.*) The evidence concerning the robbery was far less inflammatory than the testimony concerning the current offense. (*Ibid.*) Moreover, the jury was instructed that it could not consider the evidence of gang activity to prove that defendant was a person of bad character or that he had a disposition to commit crime. (*Ibid.*) Although defendant offered to stipulate that the Norteños are a criminal street gang, the prosecution was not required to accept that stipulation as a sanitized alternative

---

[18] Unlike the present case, the defendant's separate offense in *Tran* was gang related. (*Tran, supra*, 51 Cal.4th at pp. 1045-1046.) As previously mentioned, however, a separate offense need not be gang related to qualify as a predicate offense under section 182.66, subdivision (f). (*Gardeley, supra,* 14 Cal.4th at pp. 610, 621-622.)

to presenting predicate offenses, and its refusal to do so does not diminish the probative value of its preferred evidence, including evidence of defendant's prior robbery conviction. (See *People v. Salcido* (2008) 44 Cal.4th 93, 147; *People v. Zambrano* (2007) 41 Cal.4th 1082, 1149, disapproved on another point in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.)

Finally, the fact that the prosecutor introduced evidence of four additional predicate offenses did not make the introduction of evidence of defendant's prior robbery conviction cumulative. There is no bright line rule concerning the permissible number of predicate offenses that may be introduced to prove a gang enhancement. (*Hill, supra*, 191 Cal.App.4th 1104, 1139.) The relevant statute, section 186.22, subdivision (e), requires evidence of "two or more" predicate offenses. In *Tran*, the court observed that "although the court need not limit the prosecution's evidence to one or two separate offenses . . . , the probative value of the evidence inevitably decreases with each additional offense, while its prejudicial effect increases, tilting the balance towards exclusion." (*Tran, supra*, 51 Cal.4th at p. 1049.) In *Hill*, the court found that the trial court did not abuse its discretion in admitting evidence of eight predicate offenses where the prosecution sought to introduce evidence of ten, the trial court exercised its discretion and eliminated two, and the admission of the eight predicate offenses "created neither a 'street brawl' nor 'endless discussions.' " (*Hill,* at p. 1139.)

Here, the admission of the five predicate offenses "created neither a 'street brawl' nor 'endless discussions.' " (*Hill, supra*, 51 Cal.4th at p. 1139.) As detailed above, they were used to prove an essential element of the gang-murder special circumstance and gang enhancement -- that the Norteño criminal street gang is involved in a pattern of criminal activity. As the People observe, "Three of those predicate offenses, including [defendant's] prior offense, occurred in Santa Clara County and were introduced by the gang expert from that county [(Whittington)]," while the other two "occurred in Shasta County and were introduced by the gang expert from that county [(Marquez)], who

33

testified that Norteños were attempting to establish a stronghold in Shasta County." As the People suggest, the trial court reasonably could conclude that "[t]he various predicate offenses from both locales were necessary to show that the Norteño gang had been established in Shasta County, that it was under the same umbrella as the gang in Santa Clara County, and that any predicate offenses committed in Shasta County would benefit the gang just as they would if they were committed in Santa Clara County."

For all the foregoing reasons, the trial court did not abuse its discretion in admitting evidence of defendant's prior robbery conviction.

V

There is Insufficient Evidence to Support the Jury's Findings on the
Gang-enhancement and Gang-murder Special-circumstance Allegations

Defendant next claims that there is insufficient evidence that he "formed the intent to benefit the gang or assist [in] criminal conduct by gang members before the homicide was complete," and thus, the jury findings as to the gang enhancement and gang-murder special circumstance and must be reversed. We agree and shall reverse those findings.

As detailed above, the jury found defendant guilty of first degree murder, and found true criminal-street-gang special-circumstance and gang-enhancement allegations. In order to sustain a true finding on the gang-enhancement allegation, the prosecution was required to prove that the crime was "committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members." (§ 186.22, subd. (b)(4).) "[T]he Legislature included the requirement that the crime to be enhanced be committed for the benefit of, at the direction of, or in association with a criminal street gang to make it 'clear that a criminal offense is subject to increased punishment under the STEP Act only if the crime is "gang related." ' [Citation.]" (*Albillar, supra,* 51 Cal.4th at p. 60.) "Not every crime committed by gang members is related to a gang." (*Ibid.*) The gang-enhancement statute "does not pose a risk of conviction for mere nominal or passive

34

involvement with a gang. . . . Rather, it applies when a defendant has personally committed a gang-related felony with the specific intent to aid members of that gang." (*Id.* at pp. 67-68.)

In considering a challenge to the sufficiency of the evidence in a criminal case, "we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] We presume every fact in support of the judgment the trier of fact could have reasonably deduced from the evidence. [Citation.] If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding. [Citation.] 'A reviewing court neither reweighs evidence nor reevaluates a witness's credibility.' [Citation.]" (*Albillar*, *supra*, 51 Cal.4th at pp. 59-60.)

"Expert opinion that particular criminal conduct benefited a gang by enhancing its reputation for viciousness can be sufficient to raise the inference that the conduct was 'committed for the benefit of . . . a[] criminal street gang' within the meaning of section 186.22 [subdivision] (b)(1)." (*Albillar, supra*, 51 Cal.4th at p. 63.) However, expert opinion testimony constitutes substantial evidence only if based on conclusions or assumptions supported by evidence in the record. (*Roddenberry v. Roddenberry* (1996) 44 Cal.App.4th 634, 651-652.) "Where an expert bases his conclusion upon assumptions which are not supported by the record, upon matters which are not reasonably relied upon by other experts, or upon factors which are speculative, remote or conjectural, then his conclusion has no evidentiary value. [Citations.] In those circumstances the expert's opinion cannot rise to the dignity of substantial evidence. [Citation.]" (*Pacific Gas & Electric v. Zuckerman* (1987) 189 Cal.App.3d 1113, 1135; see also *In re Daniel C.* (2011) 195 Cal.App.4th 1350, 1363-1364 (*Daniel C.*) [gang expert's testimony was

insufficient to sustain conviction when the "underlying premise" of the expert's opinion was "factually incorrect"].)

Daniel C., supra, 195 Cal.App.4th 1350, is instructive. In that case, a store employee saw three young men walking around a supermarket at midnight. (Id. at p. 1353.) All three wore articles of clothing with red elements. (Id. at p. 1354.) Two left the store, and the third, the defendant, headed toward the liquor aisle. (Id. at p. 1353.) The employee confronted the defendant when he attempted to leave the store with a bottle of liquor without paying for it. (Ibid.) The bottle broke as the defendant swung it at the employee. (Ibid.) The defendant hit the employee on the ear with the neck of the bottle, ran out of the store, and drove off in a truck with his companions. (Id. at pp. 1353-1354.) A gang expert testified that the defendant and one of his companions were active Norteños, while the third was a Norteño affiliate. (Id. at p. 1355.) The expert opined that the robbery was committed to further the interests of the Norteño gang in that gangs commit violent crimes to gain respect and to intimidate others in the community. (Id. at p. 1363.) The juvenile court sustained a robbery charge with a gang enhancement. (Id. at p. 1358.)

The Court of Appeal reversed the true finding as to the gang enhancement. (Daniel C., supra, 195 Cal.App.4th 1350.) It found no factual support for the expert's opinion. (Id. at pp. 1353-1354.) As the defendant's companions had already left the store, the assault was not committed in association with them. (Id. at p. 1361.) The purported objective of gang intimidation was also unfulfilled, as no gang words or signs were employed during the crime and the witnesses were unaware of the gang associations of the three men. (Id. at p. 1363.) The court noted that the juvenile court had found "that appellant's assault on [the employee] was simply a spur-of-the-moment reaction to [the employee's] attempt to grab the bottle from him." (Ibid.) Thus, the court concluded that "the underlying premise of [the expert's] opinion, that the participants planned or

36

executed a violent crime in concert in order to enhance their respect in the community, or to instill fear, was factually incorrect." (*Id.* at pp. 1363-1364.)

Here, as in *Daniel C.*, the evidence shows that the crime was unplanned. Defendant was drawn into a dispute between his sister and four strangers over his sister's dog. The other purported gang member, defendant's uncle, was not present when defendant stabbed Sue. He was in defendant's sister's backyard. Thus, the crime was not committed in association with another purported gang member. Defendant did not flash any gang signs or make any gang-related statements during the fight, and there was no evidence that Sue or his companions were aware of defendant's gang status. Moreover, defendant did not initially respond to the dispute between his sister and the four men with violence. To the contrary, he spoke to the four men, listened to their side of the story, and shook their hands before they got into their truck to leave. Had his sister not shattered one of the truck's windows, it appears from the record that defendant simply intended to return to the party. It was only after his sister smashed the window and a fight ensued that defendant resorted to violence. Thus, like *Daniel C.*, there is no evidence to support the gang experts' opinions in this case that the crime described in the hypothetical posed by the prosecution based on the circumstances of this case was gang related. An " ' "expert's opinion is no better than the facts on which it is based." [Citation.]' [Citation.]" (*Daniel C., supra*, 195 Cal.App.4th at p. 1364.)

The People make much of the fact that defendant, a Norteño, wore red to the party, directed his uncle, a purported Norteño, to do the same, and told his uncle, "I did what I had to do" after stabbing Sue. They claim that "[a] rational jury could have reasonably inferred from that evidence, while considering the expert testimony regarding gang lifestyle and reputation, that [defendant] committed the crime because he was a representative of his gang who had been ready to 'defend the household' and commit violence on behalf of the gang as required by gang rules if the occasion presented itself during the party." There are several problems with the People's claim. While it

37

reasonably could be inferred that defendant intended to establish a gang presence at the party by wearing red and directing his uncle to do the same, "[m]ere active and knowing participation in a criminal street gang is not a crime." (*People v. Rodriguez* (2012) 55 Cal.4th 1125, 1130.) Moreover, it does not follow that the stabbing was committed for the benefit of, at the direction of, or in association with a criminal street gang, or that defendant acted with the intent of promoting, furthering, or assisting criminal conduct by gang members. There is no evidence that Sue or his companions were gang members. There is no evidence defendant went to his sister's birthday party intending to engage in any violent behavior. To the contrary, as detailed above, the evidence shows that the confrontation was not planned, nor was it instigated by defendant. Rather, defendant was drawn into a dispute between his sister and the four men over his sister's dog. Significantly, defendant's initial response was to resolve the dispute through discourse, not violence. It was only after his sister smashed the truck's window and a fight ensued that defendant resorted to violence.

As the People note, the prosecution's experts testified regarding gang lifestyle and reputation. Both testified that violence is part of gang life and that gang members are obligated to retaliate with violence when a family member is disrespected or risk losing stature within the gang and being viewed as weak. Here, however, defendant did not retaliate with violence when his sister became involved in a dispute with the four men. He attempted to settle the dispute peacefully by talking with the four men and shaking their hands, and it was only after his sister smashed the truck's window and a fight ensued that he resorted to violence. As Marquez acknowledged, defendant's initial reaction was "completely out of character" for a Norteño.

Defendant's statement to his uncle that "I did what I had to do," is ambiguous at best. While it could be construed, as the People suggest, as indicating he was acting in accordance with established Norteño rules when he stabbed Sue, it could just as easily be

38

construed as meaning that he did what he had to do to protect his sister or himself, and thus, does not constitute substantial evidence that the stabbing was gang related.

The People also assert that defendant's "conduct after the stabbing was circumstantial evidence that he committed the crime with the intent to benefit the Norteño gang and further the criminal activity of its members." Specifically, they assert that defendant "repeatedly used his membership status in the Norteño gang as a tool to persuade other witnesses not to talk to law enforcement about what he had done." The portions of the record cited by the People do not support their assertion. Rather, they show that defendant told Donica Wilson that he had injured himself in an automobile accident and confirmed that she understood what he had said, and defendant's mother told Donica Wilson that defendant would kill her family if she told police what she had seen. In any event, even if there was such evidence, it would not support a finding that the stabbing itself was gang related. A defendant's attempt to use his gang status to dissuade witnesses from talking to the police after the commission of a crime, without more, does not establish that the crime itself was gang related.

Finally, the People claim that "[a] rational jury also could have reasonably inferred that [defendant] intentionally left his red hat next to the victim as a calling card to witnesses that the crime was committed by and for the Norteño gang." Had there been *any* evidence that the crime was gang related, we might agree. However, there simply was no such evidence. The presence of defendant's red hat at the scene, without more, does not support a finding the crime was gang related. (*People v. Rios* (2013) 222 Cal.App.4th 542, 564 [finding of fact must be an inference drawn from evidence rather than a mere speculation to probabilities without evidence].) For all the foregoing reasons, we shall reverse the jury's true finding on the gang-enhancement allegation.

We reach the same conclusion with respect to the jury's finding on the gang-murder special circumstance. To sustain a true finding on that allegation, the prosecution was required to prove, among other things, that the murder was carried out to further the

39

activities of the criminal street gang. (§ 190.2, subd. (a)(22).) As previously discussed in connection with the gang enhancement, there is no evidence, substantial or otherwise, to support such a finding. Accordingly, we shall reverse the judgment as to the jury's true finding on the gang-murder special-circumstance allegation as well.[19]

## VI
### The Trial Court Did Not Err in Refusing to Instruct the Jury on Heat of Passion as a Lesser Included Offense of Murder, and Even If It Did, Any Error Was Harmless

Defendant next contends that the trial court erred in refusing to instruct the jury on voluntary manslaughter based on heat of passion as a lesser included offense of murder and abused its discretion in denying his motion for a new trial on the same ground. As we shall explain, the trial court's refusal to so instruct the jury was proper, and any error was harmless under any standard because the jury necessarily rejected the possibility that defendant acted in the heat of passion by convicting him of first degree murder. Thus, defendant's motion for a new trial was properly denied.

The jury was instructed under CALCRIM No. 505 that defendant was not guilty of murder or manslaughter if he acted reasonably in defense of another and under CALCRIM No. 571 that he was guilty of the lesser included offense of voluntary manslaughter if he acted unreasonably in defense of another. It was also instructed under CALCRIM No. 521 that defendant was guilty of first degree murder as opposed to second degree murder if "he acted willfully, deliberately and with premeditation. The defendant acted willfully if he intended to kill. The defendant acted deliberately if he carefully weighed the considerations for and against his choice and, knowing the consequences, decided to kill. The defendant acted with premeditation if he decided to

---

[19]  Because we reverse the judgment as to the gang-murder special-circumstance and gang-enhancement findings, we need not consider defendant's claim that the his trial counsel was ineffective in failing to request a pinpoint instruction relative to those allegations.

kill before completing the act that caused death. [¶] . . . A decision to kill made rashly, impulsively or without careful consideration is not deliberate and premeditated." The trial court refused defendant's request to instruct the jury pursuant to CALCRIM No. 570 that a killing that would otherwise be murder is reduced to voluntary manslaughter if defendant acted based on a sudden quarrel or heat of passion because it did not "believe there was any actual provocation or evidence of provocation by the victim toward the defendant."[20] After the verdict, defendant moved for a new trial based in part on the failure to give a heat of passion instruction, and the motion was denied.

A trial court must instruct the jury on all general principles of law relevant to the issues raised by the evidence, including lesser included offenses. (*People v. Moye* (2009) 47 Cal.4th 537, 548 (*Moye*).) Instructions on a lesser included offense must be given when there is substantial evidence from which the jury could conclude the defendant is guilty of the lesser offense, but not the greater. (*People v. Thomas* (2012) 53 Cal.4th 771, 813.) The existence of any evidence, no matter how weak, will not justify instruction on a lesser included offense. (*People v. Whalen* (2013) 56 Cal.4th 1, 68.)

We independently review the question of whether the trial court erred by failing to instruct on a lesser included offense. (*People v. Souza* (2012) 54 Cal.4th 90, 113.) When considering whether lesser included offense instructions should have been given, we view the evidence in the light most favorable to the defendant. (*People v. Millbrook* (2014) 222 Cal.App.4th 1122, 1137.)

---

[20] CALCRIM No. 570 provides in part: "A killing that would otherwise be murder is reduced to voluntary manslaughter if the defendant killed someone because of a sudden quarrel or in the heat of passion. [¶] The defendant killed someone because of a sudden quarrel or in the heat of passion if: [¶] 1. The defendant was provoked; [¶] 2. As a result of the provocation, the defendant acted rashly and under the influence of intense emotion that obscured (his/her) reasoning or judgment; [¶] AND [¶] 3. The provocation would have caused a person of average disposition to act rashly and without due deliberation, that is, from passion rather than from judgment."

Voluntary manslaughter is the intentional but nonmalicious killing of a human being, and is a lesser offense of murder. (§ 192, subd. (a); *Moye*, *supra*, 47 Cal.4th at p. 549.) A killing may be reduced from murder to voluntary manslaughter if it occurs upon a sudden quarrel or in the heat of passion on sufficient provocation, or if the defendant kills in the unreasonable, but good faith, belief that deadly force is necessary in defense of another. (*People v. Beltran* (2013) 56 Cal.4th 935, 942, 951 (*Beltran*); *People v. Manriquez* (2005) 37 Cal.4th 547, 583.)

"Heat of passion arises when 'at the time of the killing, the reason of the accused was obscured or disturbed by passion to such an extent as would cause the ordinarily reasonable person of average disposition to act rashly and without deliberation and reflection, and from such passion rather than from judgment.' [Citations.]" (*People v. Barton* (1995) 12 Cal.4th 186, 201.) " ' "Although section 192, subdivision (a), refers to 'sudden quarrel or heat of passion,' the factor which distinguishes the 'heat of passion' form of voluntary manslaughter from murder is provocation." ' " (*People v. Souza*, *supra*, 54 Cal.4th at p. 116.)

A heat of passion theory of manslaughter thus has both an objective and a subjective component. (*Moye*, *supra*, 47 Cal.4th at p. 549.) "The provocation which incites the defendant to homicidal conduct . . . must be caused by the victim . . . or be conduct reasonably believed by the defendant to have been engaged in by the victim." (*People v. Lee* (1999) 20 Cal.4th 47, 59.) The victim's conduct may have been physical or verbal, but it must have been sufficiently provocative to cause an ordinary person of average disposition to act rashly or without due deliberation and reflection. (*Beltran*, *supra*, 56 Cal.4th at p. 939.)

To satisfy the subjective component, the defendant must have killed "while under 'the actual influence of a strong passion' induced by [adequate] provocation." (*Moye*, supra, 47 Cal.4th at p. 550.) " ' "[N]o specific type of provocation [is] required," ' " and "the passion aroused need not be anger or rage, but can be any ' " '[v]iolent, intense,

42

high-wrought or enthusiastic emotion' " ' [citations] other than revenge [citation]."
(*People v. Breverman* (1998) 19 Cal.4th 142, 163.)

Here, the evidence showed that defendant's sister was intoxicated and hysterical at all relevant times herein. When she initially accused the four men of kicking her dog, defendant intervened and the matter was peacefully resolved. Thereafter, the four men got inside a truck and were preparing to leave, when defendant's sister shattered the truck's window with her keys. At that point, the victim Sue and the other three men got out of the truck. Jim, who had been seated in the backseat of the truck, testified that when he got out, he observed a "tussle" about 10 feet behind the truck involving Sue and "like three other people," including defendant and defendant's sister. They were "swinging and fighting." Defendant's sister testified that Sue attempted to punch her but missed. Defendant then stepped in front of her and fought with Sue. Sue then fell to the ground. Immediately thereafter, defendant got into a car driven by his mother. Before they drove off, defendant got out of the car and retrieved his knife.

Even assuming a jury could find Sue's conduct sufficiently provocative to cause an ordinary person of average disposition to act rashly or without due deliberation and reflection, there is no evidence defendant actually, subjectively killed under the heat of passion. More specifically, there is no evidence, direct or circumstantial, that would support an inference that defendant subjectively harbored such strong passion, or acted rashly or impulsively while under its influence when he stabbed Sue. To the contrary, what little evidence there is regarding defendant's state of mind suggests that his judgment was not obscured. After stabbing Sue, defendant immediately proceeded to a waiting car, driven by his mother, and before departing, had the presence of mind to get out of the car, return to the scene, and retrieve the murder weapon. Because there is insufficient evidence to support the subjective component of a heat of passion theory of manslaughter, the trial court properly refused to instruct the jury on that theory. (*People v. Holloway* (2004) 33 Cal.4th 96, 141 ["[N]o fundamental unfairness or loss of verdict

43

reliability results from the lack of instructions on a lesser included offense that is unsupported by any evidence upon which a reasonable jury could rely."].)

In any event, any error in failing to give a heat of passion instruction was harmless. "Error in failing to instruct the jury on a lesser included offense is harmless when the jury necessarily decides the factual questions posed by the omitted instructions adversely to [the] defendant under other properly given instructions." (*People v. Lewis* (2001) 25 Cal.4th 610, 646.) Here, the jury was instructed that it could not return a verdict of first degree murder unless it found that defendant "carefully weighed the considerations for and against his choice and, knowing the consequences, decided to kill." As our colleagues in Division One of the First District Court of Appeal recently recognized in *People v. Peau* (2015) 236 Cal.App.4th 823, 831-832, such a finding is inconsistent with a finding the defendant acted in a heat of passion. Defendant acknowledges that the jury "implicitly found [he] premediated the act" by finding him guilty of first degree murder, but argues that the "finding must be given little weight because of the vast amount of . . . improper gang evidence admitted likely prejudiced the jury." As detailed above, the gang evidence was properly admitted. Because the jury necessarily found that Sue's murder was willful, deliberate, and premeditated, we conclude that any error in failing to give a heat of passion instruction was harmless beyond a reasonable doubt, and that the trial court properly denied his motion for a new trial to the extent it was based on the failure to so instruct the jury. (See *Peau,* at p. 828.)

## VII
## There Was No Cumulative Error

Defendant claims that the cumulative effect of the trial court's errors requires reversal of the judgment. We have concluded that the only potential error was the failure to give a heat of passion instruction, and that any such error was harmless under any standard. There are no additional errors to cumulate with that error.

44

## VIII
### The Minute Order Must Be Corrected to Reflect
### That The Trial Court Found Defendant Had One Prior Strike Conviction

Finally, defendant contends, and the People concede, that a May 1, 2013, minute order should be corrected to conform to the trial court's finding that defendant had one prior strike conviction, *not two*, within the meaning of section 1170.12. We agree.

The first amended information only alleged one prior strike conviction under section 1170.12, and the trial court only determined that defendant had one prior strike conviction within the meaning of that section. The minute order, however, erroneously states that the trial court found true "Special Allegation of 2 PRIOR SERIOUS OR VIOLENT FELONIES pursuant to Section 1170.12 of the Penal Code." We shall direct the trial court to correct the minute order to conform with the trial court's finding. (*People v. Farell* (2002) 28 Cal.4th 381, 384, fn. 2.)

### DISPOSITION

The judgment is reversed as to the true findings on the gang-murder special circumstance and gang enhancement, and otherwise affirmed. The trial court is directed on remand to strike those true findings from the record of conviction and resentence defendant. The trial court also is directed to correct the May 1, 2013, minute order to reflect that the trial court found defendant has one prior conviction within the meaning of section 1170.12.

/s/
Blease, Acting P. J.

I concur:


/s/
Hoch, J.

45

Mauro, J., Dissenting.

Part V of the majority opinion concludes there is insufficient evidence to support the true findings on the gang-murder special circumstance and gang-enhancement allegations. The majority opinion reverses the judgment as to those findings and otherwise affirms the judgment. I disagree with Part V of the majority opinion and the disposition pertaining to Part V. I otherwise concur with Parts I through IV and VI through VIII of the majority opinion and the remainder of the disposition. I would affirm the judgment.

The jury found defendant Vincent Gino Chavez guilty of the first degree murder of Sue Saeturn (Pen. Code, § 187, subd. (a))[1] and found true the special circumstance that defendant intentionally killed Sue while defendant was an active participant in a criminal street gang and that the murder was carried out to further the activities of the gang. (§ 190.2, subd. (a)(22).) The jury also found true allegations that the murder was committed for the benefit of, at the direction of, or in association with a criminal street gang, with the specific intent to promote, further, or assist in criminal conduct by gang members. (§ 186.22, subd. (b).)

Defendant contends there is insufficient evidence that he "formed the intent to benefit the gang or assist [in] criminal conduct by gang members before the homicide was complete" and thus the jury findings as to the gang enhancement and gang-murder special circumstance must be reversed. The majority agrees, but I disagree.

---

[1] Undesignated statutory references are to the Penal Code.

1

In considering a challenge to the sufficiency of the evidence in a criminal case, "we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence -- that is, evidence that is reasonable, credible, and of solid value -- from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] We presume every fact in support of the judgment the trier of fact could have reasonably deduced from the evidence. [Citation.] If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding. [Citation.] 'A reviewing court neither reweighs evidence nor reevaluates a witness's credibility.' [Citation.]" (*People v. Albillar* (2010) 51 Cal.4th 47, 59-60.) Expert opinion that particular criminal conduct benefited a gang by enhancing its reputation for viciousness can be sufficient to raise the inference that the conduct was committed for the benefit of a criminal street gang. (*Id.* at p. 63.)

Applying the foregoing standards, I believe there is substantial evidence from which a reasonable jury could find true the gang-murder special circumstance and gang-enhancement allegations.

Michael Whittington, a former gang detective and gang intelligence officer with the San Jose Police Department, testified for the prosecution as an expert on gangs. Whittington explained that violence is a part of gang life, and that it "is done in order to enact fear in the community, [and] fear in rivals for the purposes of gaining territory and control." It is common for gang members to carry weapons. "Weapons are tools of the trade" and "benefit the gang because the gang needs to be able to fight at a moment's

2

notice; therefore, weapons will traditionally be found in or around gang members."

In gang culture, respect is synonymous with fear. Whittington testified that Norteños claim the color red and dress in the colors red, black, and white. Whittington opined that defendant is a Norteño gang member based on his tattoos, his writings, his prior conviction, and his actions on the night in question.

Whittington further testified that gang members are obligated to retaliate with violence when a family member is disrespected.

Robert Marquez, a veteran gang investigator who had been assigned to the Redding Police Department, also testified as a gang expert for the prosecution. According to Marquez, violence is crucial to all prison and street gangs because it translates into fear, which translates into power. Fear benefits the gang because it helps it control its members, creates a level of notoriety which helps with recruiting new members, and dissuades members of the community from reporting the criminal activities of gang members. Marquez opined that defendant was a Norteño gang member and a Northern Structure prison associate. He based his opinion on two incidents. The first incident occurred in Corning and involved defendant attacking a rival gang member while wearing clothing associated with the Norteño street gang, shouting Norteño gang terms, and throwing Norteño gang signs. The second incident occurred at the Tehama County Jail and involved defendant assaulting another prisoner. The victim advised jail staff that he believed defendant attacked him on behalf of another Norteño with whom the victim had argued.

Dr. Rahn Minagawa, a clinical and forensic psychologist, testified for the *defense* as an expert in gang psychology. Minagawa testified defendant was a Norteño gang member. He based his opinion on defendant's tattoos, history, and prior interactions with law enforcement.

During closing argument, defense counsel conceded defendant is a gang member.

On the night of the murder, defendant attended a birthday party at his sister's home. Defendant's mother drove defendant, his uncle, and his uncle's girlfriend to the party. Prior to the party, defendant texted his uncle and told him to wear red. Defendant wore a red hat and red shirt to the party. Defendant's uncle wore red shoes and a red belt, and he also died his facial hair red and had a red bandana in his back pocket. Defendant's uncle testified red is the primary color of the Norteño gang. Responding to a hypothetical similar to the facts of this case, Michael Whittington noted that by wearing red and showing visible tattoos, the individuals in the hypothetical were demonstrating their allegiance to the gang and showing their strength in numbers. Here, the jury could infer from the evidence that defendant intended to show gang colors that evening in support of his gang. Defendant's uncle also testified Norteño gang members often use monikers and that defendant's moniker was "Monster." Defendant's uncle and his then girlfriend testified that defendant usually carried a pocket knife in his back pocket. The jury could infer that the knife was a tool of the gang trade and carrying it benefitted the gang because a gang member must be ready to fight at a moment's notice.

The majority notes that mere active and knowing participation in a criminal street gang is not a crime. (*People v. Rodriguez* (2012) 55 Cal.4th 1125, 1130.) But as I will

4

explain, here the jury could infer defendant did more than merely belong to a gang, wear gang colors and carry a weapon for the gang.

That night, Sue and others left a party across the street from defendant's sister's house and walked to a truck parked nearby. Defendant's sister owned a dog and thought she saw one of the members of Sue's group kick the dog. The majority makes much of the fact that there was an initial cordial exchange between the two groups, but the jury could infer that at the time of the cordial exchange, defendant did not view Sue as having disrespected defendant's sister. After defendant's sister shattered the truck window, however, the driver of the truck began screaming and Sue tried to punch defendant's sister. The jury could infer that once Sue tried to hit defendant's sister, defendant viewed Sue as having disrespected his sister. The jury could also deduce that defendant, a gang member, felt obligated to retaliate with violence when his sister was disrespected, furthering the activities of his gang by stabbing Sue in the chest more than once.

Although defendant made a point to retrieve his knife from the scene of the crime, his red hat was left next to Sue's body. Later, defendant's uncle sent a text to defendant stating, "And your hat, nigga, you got them outtie." The jury could infer that defendant left the red hat at the murder scene as a gang calling card to spread fear of, and respect for, the gang.

Defendant's mother drove defendant to the home of Donica and John Wilson so that defendant could wash the blood off his hands. The jury could infer that defendant's mother was assisting defendant in evading the police. Before leaving Donica's home, defendant told Donica the blood was from a car accident. Donica said she "understood."

5

Defendant asked, "Do you really understand?" to which Donica replied, "Yes, I do." After the incident, defendant told his sister people who talk to the police are beaten or killed. The jury could infer that defendant was seeking to dissuade witnesses by instilling fear of gang retaliation. This inference is further supported by the evidence that defendant's mother told Donica defendant would kill Donica's whole family if she told the police what she had seen. Defendant's mother pleaded guilty to dissuading a witness by force or threat and influencing testimony by a bribe in connection with this case, and she *admitted* those crimes were committed for the benefit of, in association with, or at the direction of a criminal street gang.

Defendant's uncle asked defendant what happened at the murder scene and defendant responded, "I did what I had to do." The majority says defendant's response is ambiguous, could be construed in different ways, and "could just as easily be construed as meaning that he did what he had to do to protect his sister" or himself. (Maj. opn., *ante*, at pp. 38-39.) But our job is not to reweigh the evidence or consider ways in which the jury could have reached a different result. Our job is to view the evidence in the light most favorable to the judgment and determine whether there is substantial evidence to support the jury verdict. Here, the jury could infer that when defendant said he did what he had to do, he meant he had to respond to the disrespect directed toward the sister of a gang member.

Responding to a hypothetical based on these facts, Marquez testified that in responding violently to the disrespect shown to his immediate family member, the gang member in the hypothetical acted in accordance with established street-gang rules.

6

Had the gang member failed to respond in that manner he would have lost stature in the gang and been viewed as weak. The crime benefited the gang because the "sheer ferocity" of the act would encourage fellow gang members to follow orders and would instill fear in the community. It would also increase the gang member's notoriety within the gang and the gang's stature within the community.

The majority notes there is no evidence Sue or his companions were gang members. But there is also no evidence gang members only commit crimes against other gang members. Rather, there is evidence gang members are obligated to retaliate with violence when a family member is disrespected. The jury could deduce that Sue was a victim because he disrespected the sister of a gang member.

The majority also explains there is no evidence defendant went to his sister's birthday party intending to engage in violent behavior. But based on the evidence, the jury could infer defendant came to the party armed and ready to fight in furtherance of the gang at a moment's notice.

The record indicates defendant did not make any gang-related statements or flash any gang signs during the fight with Sue; and after the murder defendant told his sister "I did it for you." Again, however, as long as there is substantial evidence to support the verdict, it does not matter whether there is other evidence that would support a different result. Here, the jury could find defendant was a gang member who wore gang colors, had gang tattoos, encouraged his uncle to wear gang colors, carried a knife to a birthday party, had attacked people in support of the gang in the past, was motivated to retaliate with violence when his sister was disrespected, killed the person who disrespected his

sister by stabbing him repeatedly, left his red hat next to the victim, threatened witnesses, and did all those things in furtherance of the gang.

Considering the evidence in the light most favorable to the judgment, and presuming every fact in support of the judgment the trier of fact could reasonably deduce from the evidence, I believe there is substantial evidence to support the judgment. I would affirm the judgment.

                                                              /s/\
                                                      Mauro, J.